UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

BILLY ANDERSON
and JEMEL ANDERSON,

    Plaintiffs,

v.

PRINCE GEORGE'S COUNTY,
MARYLAND,
MICHAEL ROWE and
CHRISTOPHER PERRY,

    Defendants.

Civil Action No. TDC-13-1509

**MEMORANDUM OPINION**

This case arises out of the alleged kidnapping, assault, and battery of Plaintiff Jemel Anderson[1] ("Anderson") on May 28, 2012 by Defendants Christopher Perry ("Perry") and Michael Rowe ("Rowe"), who were both Prince George's County police officers at the time of the incident. Pending before the Court is a Motion for Summary Judgment, ECF No. 77, filed by Defendant Prince George's County, Maryland (the "County"). The issue before the Court is whether there is sufficient evidence to support a finding that Perry and Rowe were acting within the scope of their employment during the alleged incident, such that the County would be liable for their actions. The Court has reviewed the pleadings and briefs, and it held a hearing on

---

[1] At the time of the incident in question, Jemel Anderson was 17 years old. He originally filed this suit through Plaintiff Billy Anderson, as his guardian and next friend. Because Jemel Anderson has since reached the age of 18, he has been added to the case as a named plaintiff. Billy Anderson, who alleges that he has incurred hospital and medical expenses to care for Jemel Anderson as a result of the injuries he sustained during incident, remains a party in this case on his own behalf. The Court refers to them collectively as "Plaintiffs."

September 2, 2015. For the reasons stated below, the Motion for Summary Judgment is DENIED.

## BACKGROUND

On May 28, 2012, Willie Smith had a cookout at his home in Charles County, Maryland, at which Anderson was present. While Anderson and his friends were playing in Willie Smith's yard, one of the friends, Josiah Maldonado ("Maldonado"), took a bottle of vodka from a cooler and handed it to Anderson, who then put it in a car parked in front of Willie Smith's home. The car was then driven to a cul de sac down the street, and Anderson, Maldonado, and their friend Javon Smith, who is not related to Willie Smith, went to where the car was parked and drank some of the vodka. When Willie Smith realized his vodka was missing, he and another man walked around the neighborhood to look for Anderson and his friends. When Willie Smith saw Javon Smith, he asked if Javon Smith and his friends had taken his vodka and asked to look in the backpack that Javon Smith was carrying. When he looked inside, Willie Smith did not see his bottle of vodka, but he claims that he saw a handgun inside.

On that same day, Rowe and his fiancée went to dinner at Perry's home, which is in the same neighborhood as Willie Smith's house. At the time, both Perry and Rowe, who were Prince George's County police officers, were not on duty and not in uniform. While they were in Perry's backyard, they saw Willie Smith, along with 40 to 50 other people, coming down the street toward them in an agitated state. Willie Smith knew Perry to be a police officer who lived in his neighborhood. Perry did not previously know Willie Smith.

Willie Smith, who appeared panicked, ran up to the front of Perry's house and gestured to Perry to come over. When Perry met with him, Willie Smith pointed out two boys on bicycles and one on foot and told Perry that the boys had "crashed my barbecue" and stolen a bottle of

alcohol, and that when Willie Smith looked in one of the boys' backpack for the bottle, he had seen a gun. Dep. Perry Vol. I at 122, 124, Mot. Summ. J., Ex. 5a, ECF No. 77-6.

Perry and Rowe then got into Perry's marked Prince George's County Police Department ("PGPD") cruiser and pursued Anderson and his friends. Although both Perry and Rowe remained out of uniform, Rowe had his badge and department-issued firearm in his possession. Both Rowe and Perry believed they were in an emergency situation, and that a reported gun in the hands of a minor created a possible danger to the community. They attempted to radio the Charles County Sheriff's Office ("CCSO") but were unsuccessful. According to Rowe, they did not attempt to radio PGPD because they knew that they were out of range. Neither officer had his cell phone with him. According to Perry, Willie Smith had also informed them that he had called the police, and that several other neighbors had called the police, because of the commotion.

Perry drove the PGPD cruiser until they saw the three boys identified by Willie Smith. At the time, Perry did not have authorization, as is required, to have the PGPD cruiser outside of Prince George's County. As Perry pulled up to the area where the three boys were standing, the boys took off running into the woods, leaving the two bicycles behind. Assuming the bicycles were stolen property, Perry and Rowe put the bicycles in the trunk of the cruiser and drove to a townhouse development on the other side of the neighborhood, where they believed that the boys would exit the woods.

Once on foot, Anderson and his friends ran and hid in a shed in a backyard for approximately five minutes and then, believing that they had eluded Perry and Rowe, began to leave. When they then saw Perry and Rowe, they began running in different directions. As they

were chasing the boys, both Perry and Rowe called out that they were police officers and ordered the boys to stop running.

During the chase, Anderson and Javon Smith ran and hid behind a tree when Rowe came up from behind and grabbed Javon Smith. Rowe took Javon Smith to the cruiser, handcuffed him using leg cuffs that were in the cruiser, and sat him in the front seat, while Perry continued to pursue Anderson. According to Anderson, Perry called out that he would shoot if Anderson did not stop, so Anderson stopped running, got down on his knees, and put his hands behind his head.[2] Anderson alleges that at this point, Perry beat him about the face and head with his fists before picking him off of the ground, handcuffing him, walking him back to the cruiser, and placing him in the backseat. No firearm was recovered from either Anderson or Javon Smith.

After putting the two boys in the car, Perry and Rowe asked Anderson and Javon Smith for the address of their other friend, to which Javon Smith responded with a false address. When they arrived at the false address, Rowe got out of the car and knocked on the door to the home. While Rowe was at the door, Javon Smith was able to get his hands free and fled the car. Perry followed in pursuit but lost Javon Smith. Rowe then got back in the car and drove to pick up Perry.

Perry and Rowe drove around looking for Javon Smith. At some point as they were driving, Perry saw an oncoming CCSO cruiser and activated his emergency lights in order to flag it down, but the car kept going. Left with only Anderson, Perry asked Anderson where Javon Smith lived. When Anderson would not tell the officers the correct address or his own address, Perry directed Rowe to drive to Indian Head Rail Trail, where Perry intended to drop off Anderson at a well-known landmark from which he could be picked up later and taken home.

---

[2] According to Perry, Anderson simply gave up when he appeared to tire out and was found lying face down on the ground.

But when they arrived there, the road was blocked by pillars that prevented Rowe from driving the cruiser down the trail, so Perry directed Rowe to the area of the Countywide Pool. There, Perry removed the handcuffs from Anderson and told him to use his cell phone to call someone to give him a ride home. Perry and Rowe then drove back to Willie Smith's home to see if anyone there knew who owned the bicycles that had been abandoned by the boys.

According to Perry, he intended to report the incident and transfer the seized bicycles to PGPD the next day, but before he could do so, he and Rowe were stripped of their powers as police officers by PGPD internal affairs. Anderson has alleged that he suffered physical and mental injuries as a result of his encounter with Perry and Rowe.

Based on their conduct, Perry and Rowe were arrested and charged in the Circuit Court for Charles County with attempted kidnapping, kidnapping, attempted false imprisonment, assault in the second degree, and misconduct in office. They each entered pleas of *nolo contendre* to second degree assault and were sentenced to 10 years of imprisonment, with all but one year suspended.

On May 23, 2013, Billy Anderson, on behalf of himself and as guardian and next friend of Jemel Anderson, brought this action against Perry and Rowe for assault and battery (Count I), intentional infliction of emotional distress (Count II), false imprisonment (Count III), negligence (Count IV), and federal constitutional violations (excessive force and unreasonable seizure) under 42 U.S.C. §§ 1983 and 1988 (Count V). Count VI alleges that Perry, Rowe, and the County violated Anderson's rights under the Maryland Declaration of Rights. In that count, the Plaintiffs allege that the County is liable for the actions of Perry and Rowe because they were the County's "actual and/or apparent agents, servant, and/or employees" and were "acting under color of state law, and/or within the course and scope of their actual and/or apparent employment

and/or authority" when they caused Anderson's injuries. Second Am. Compl. ¶ 34, ECF No. 69.[3] The County now moves for summary judgment on Count VI on the grounds that the claim fails as a matter of law because Rowe and Perry were not acting within the scope of their employment.

## DISCUSSION

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the court grants summary judgment only if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

---

[3] Plaintiffs amended the original Complaint to include additional factual allegations, *see* Am. Compl., ECF No. 43, then filed another Amended Complaint to add Jemel Anderson as a party, *see* Second Am. Compl., ECF No. 69, but the causes of action have remained the same.

## II. Scope of Employment

The sole claim against the County is Count VI, in which Plaintiffs allege that Anderson's rights under the Maryland Declaration of Rights were violated, and that the County is liable because Perry and Rowe were acting under color of state law in the course of their employment as police officers. Under Maryland law, local governments have vicarious liability under the doctrine of *respondeat superior* for civil damages resulting from state constitutional violations committed by their agents and employees "within the scope of the employment." *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999). Here, the County argues that the Court should grant summary judgment in its favor because the evidence establishes that Perry and Rowe were acting outside the scope of their employment throughout this incident.

Generally, the question whether an act is within the scope of an employee's duties is to be determined by the jury as a matter of fact, not by the court as a matter of law. *Sheets v. Chepko*, 573 A.2d 413, 414 (Md. Ct. Spec. App. 1990). The court should decide the scope of employment issue only if "there is no conflict in the evidence relating to the questions and but one inference can be drawn therefrom." *Id.* (citation omitted).

The test for determining if an employee's tortious acts were within the scope of his employment is "whether they were in furtherance of the employer's business and were 'authorized' by the employer" to engage in the acts. *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991). "Authorized" does not mean that authority must have been expressly conferred, but only that the act was "incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders." *Id.* (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 92 A. 478, 479-80 (Md. 1914) (emphasis added). In fact, an act "may be within the scope of the employment, even though forbidden or done in a forbidden manner . . . ,

7

or [even] consciously criminal or tortious." *Cox v. Prince George's County*, 460 A.2d 1038, 1042 (Md. 1983) (quoting *A & P Co. v. Noppenberger*, 189 A. 434, 440 (Md. 1937)).

In *Sawyer*, the Maryland Court of Appeals identified several factors to consider in determining whether conduct falls within the scope of employment, including whether the conduct was "of the kind" the employee is employed to perform, occurred "during a period not unreasonably disconnected from the authorized period of employment," took place "in a locality not unreasonably distant from the authorized area," and was "actuated at least in part by a purpose to serve the master." 587 A.2d at 471 (quoting *E. Coast Lines v. M. & C.C. of Balt.*, 58 A.2d 290, 304 (Md. 1948)). Additional factors include whether the employee's conduct was "expectable" or "foreseeable," whether the employee's actions were "personal" or taken "to protect [the employee's] own interests," and whether the conduct was "unprovoked, highly unusual, and quite outrageous." *Id.* (internal citations and quotation marks omitted).

### A.   Lack of Authorization

The County first argues that the Court should conclude that, as a matter of law, Perry and Rowe were acting outside the scope of employment because they were outside of Prince George's County at the time of the encounter with Anderson and therefore were not authorized to act as police officers during the incident. Under the Maryland Code, police officers may exercise their powers within Maryland but outside of their own jurisdiction when:

(i)   1. the police officer is participating in a joint investigation with officials from another state, federal, or local law enforcement unit, at least one of which has local jurisdiction;
2. the police officer is rendering assistance to another police officer;
3. the police officer is acting at the request of a police officer or State police officer; or
4. an emergency exists; and

(ii)  the police officer is acting in accordance with regulations adopted by the police officer's employing unit to carry out this section.

Md. Code Ann., Crim. Proc. § 2-102(b)(3).

The County argues that the conduct of Perry and Rowe did not fall within the parameters of this statute, so "the undisputed facts make it clear they did not act lawfully or within the scope of their employment." Mot. Summ. J. at 15. The County also notes that in using a PGPD police cruiser during this incident, Perry and Rowe were also in violation of a PGPD policy that bars a police officer from taking his police cruiser home if he lives outside of Prince George's County. They also failed to contact the PGPD or the CCSO during the encounter, as required by PGPD policy.

This argument fails because, as County counsel acknowledged at oral argument, a lack of compliance with Md. Code Ann., Crim. Proc. § 2-102(b)(3) and PGPD regulations does not automatically mean that the actions were outside the scope of employment. Under *Sawyer*, action by off-duty police officers can be within the scope of employment even if not authorized by their employer and "in opposition to his express and positive orders." *Sawyer*, 587 A.2d at 470-71. Indeed, the fact that *Sawyer* deems whether an employee's action took place at a location "not unusually distant from the authorized area" to be a factor in the scope of employment analysis makes clear that acting outside one's authorized area does not necessarily render the action outside the scope of employment. *See id.*

Moreover, there is sufficient evidence to support a conclusion that Perry and Rowe were authorized under the statute to act as police officers during this incident because they were acting in response to an "emergency." *Id.* § 2-102(b)(3)(i)(4). An emergency is defined as "a sudden or unexpected happening or an unforeseen combination of circumstances that calls for immediate action to protect the health, safety, welfare, or property of a person from actual or threatened harm or from an unlawful act." *Id.* § 2-101(b). There is no requirement that the "emergency"

9

involve a threat of death or serious bodily injury. In this case, viewing the facts in the light most favorable to the nonmoving parties, and drawing all justifiable inferences in their favor, Perry and Rowe had reason to believe, based on a report by a citizen, that there were three minors in possession of a firearm, they had stolen alcohol, and they were moving around in a residential neighborhood. The actions of the minors had apparently caused enough of a disturbance that a group of 40 to 50 agitated people had left the party, possibly in pursuit of the boys. According to Perry, it appeared that the crowd of people wanted the boys "out of the neighborhood," that it "looked like there was going to be a fight in the front of my house," and that he considered the report of a handgun in the hands of a minor to be an emergency. Dep. Perry at 118, 188, Opp. Summ. J., Ex. B, ECF No. 82-1.

Under these circumstances, although the possible lack of authorization to act under the applicable statute and regulations is a relevant factor on the issue of scope of employment, it is not dispositive. Whether it has been established as a matter of law that the actions of Perry and Rowe were outside the scope of employment requires an analysis of the evidence under the factors identified in *Sawyer*.

**B.     Analysis of the *Sawyer* Factors**

Applying the factors identified in *Sawyer*, the Court concludes that, viewing the evidence in the light most favorable to the nonmoving parties, a reasonable jury could conclude that Perry and Rowe were acting within the scope of employment. Although the incident occurred while Perry and Rowe were off-duty, they were otherwise actively employment by PGPD, so the incident occurred during a period "not unreasonably disconnected from their employment." *Sawyer*, 587 A.2d at 471. The events also took place in Charles County, a jurisdiction that

neighbors Prince George's County, and was therefore "not unreasonably distant" from the officers' authorized area of work. *Id.*

The County argues that because, in its view, Perry and Rowe did not comply with section 2-102(b)(3) of the Criminal Procedure Article of the Maryland Code and with all applicable PGPD regulations, their conduct in response to a citizen complaint in Charles County was not foreseeable. However, it is not unusual, and therefore quite foreseeable, for off-duty police officers to take action outside their home jurisdiction. In *Lovelace v. Anderson*, 730 A.2d 774 (Md. Ct. Spec. App. 1999), the court held that an off-duty police officer, who was moonlighting as a security guard at a hotel outside his jurisdiction, was acting in the scope of employment as a police officer when he intervened in an ongoing armed robbery and accidentally wounded a hotel guest. *Id.* at 786. The court concluded that the officer, "although off duty and outside of his jurisdiction, was still authorized and required to uphold the laws of the State of Maryland," and that in responding to the ongoing robbery, "the primary service [advanced] by [the officer] related to his law enforcement function of protecting the public." *Id.* Thus, particularly given the proximity to the officers' home jurisdiction, it would have been foreseeable to the County that its off-duty police officers would respond to a possible emergency, in this case a firearm in the hands of a minor, while in neighboring Charles County, regardless of whether there was strict compliance with all legal requirements. *See Sawyer*, 587 A.2d at 470-71 (noting that whether an employee's action took place at a location "not unusually distant from the authorized area" is a factor in assessing whether the action was within the scope of employment).

In addition, the conduct in question was "of a kind" that is similar to the work of police officers, and it could be viewed as taken "at least in part by a purpose to serve" the employer.

11

*Sawyer*, 587 A.2d at 471. It is undisputed that Perry and Rowe were brought into this incident by Willie Smith, a neighbor who, aware that Perry was a police officer, approached him, followed by a crowd of approximately 40 to 50 people. To Perry, Willie Smith appeared to be in a panicked state as he explained to Perry that three uninvited boys had crashed his party and stolen a bottle of liquor. He also told Perry that he had found a handgun in the backpack of one of the boys when he looked through it in search of his liquor. Believing that there were three minors in possession of stolen goods and a handgun, Perry and Rowe pursued Anderson and his friends in a marked PGPD vehicle. When the pursuit became a chase on foot, Perry and Rowe stopped to pick up what they believed to be stolen bicycles. Perry then verbally identified himself as a police officer as he chased the minors and commanded them to stop. Once Perry and Rowe had captured Anderson and Javon Smith, they placed them in handcuffs and put them in their police vehicle. When neither boy had the firearm, they apparently continued to investigate the firearm by asking for the address of the third suspect's home, then going to a false address provided by Javon Smith. When Javon Smith escaped, they asked for his address and Anderson's address, presumably both to investigate further and to bring Anderson home. A reasonable jury could conclude that these actions, regardless of their legality or propriety, were consistent with the course of conduct of police officers investigating an incident for the purposes of protecting the public from a firearm in the hands of a minor.

The same evidence supports the conclusion that Perry and Rowe acted not out of any "personal" motivation or to serve their own interests, but to serve the police mission of their employer. *Clark v. Prince George's County*, 65 A.3d 785 (Md. Ct. Spec. App. 2013), provides an example of an off-duty law enforcement officer acting out of personal motivation and thus *not* in the scope of employment. In *Clark*, a police officer who had taken the day off to wait at home

for a furniture delivery ended up in a confrontation with the deliverymen when one of them entered his daughter's bedroom and they did not comply with his demand that they leave the house. *Id.* at 788, 794. Claiming that he was assaulted by the deliverymen, the officer used his service firearm to shoot them, killing one man and permanently injuring another. *Id.* The court found that, as a matter of law, the officer had been acting outside the scope of his employment because "shooting delivery people in one's home" is not "'commonly done' by police officers," and the officer had testified that he shot to "protect himself from being beaten up in his own home . . . just as any homeowner would do," thus indicating that the officer's motive had been personal and not to serve the county or the public. *Id.* at 802. In contrast, there is no evidence here that Perry and Rowe were motivated by any personal reasons to target Anderson or his friends. They had never met any of the boys. They did not know Willie Smith and were not present at Willie Smith's cookout when the boys allegedly stole the vodka. Rather, Perry and Rowe were at Perry's house having dinner and only pursued Anderson and his friends because a neighbor, who approached Perry because he was a police officer, reported that the three boys were in possession of a firearm and stolen liquor.

The facts in *Sawyer* illustrate how the conduct of Perry and Rowe could reasonably be deemed to be "of a kind" similar to their work as police officers, and taken "at least in part by a purpose to serve," rather than motivated by personal reasons. There, the Maryland Court of Appeals held that an off-duty police officer, in civilian clothing and driving his personal car outside his jurisdiction, was acting outside the scope of his employment as a matter of law when during a confrontation with the driver of another car, he got out of his car, threw rocks at the other car, and engaged in a fight with the other driver. 587 A.2d at 468, 472. The court found as a matter of law that this activity was outside the scope of employment, because the officer had

13

acted from personal motives and "such conduct by a police officer would not be expectable," nor did it in any way further the state's interests. *Id.* at 473.

However, the court also held that it was inappropriate to decide as a matter of law whether the officer's next actions, in which he followed up the first encounter by approaching the same car at a stop sign inside his home jurisdiction, identifying himself as a police officer, telling the driver he was arresting him, and then assaulting the driver, were outside the scope of employment, because stopping a motorist and making an arrest are actions that are ordinarily within the scope of a police officer's employment. *Id.* at 473-74. Here, the actions of Perry and Rowe align much more closely with the second part of the conduct in *Sawyer*, as they had no personal reason to chase after Anderson and his friends, and their course of conduct included multiple actions consistent with police conduct, such as responding to a citizen complaint about possible criminal activity, pursuing the suspects in a police cruiser, verbally identifying themselves as police, and apprehending two of them and placing them in the police cruiser.

In arguing that the conduct of Perry and Rowe was of such a nature that it was outside the scope of their employment as a matter of law, the County points to a variety of actions that it deemed inconsistent with those of police officers investigating crime, including their failure to notify PGPD or CCSO. as required by regulations, during or after the incident, and their decision to drive Anderson to a remote location and drop him off with instructions to find his own way home. Perry and Rowe explained, however, that they attempted to radio the CCSO at the outset of the encounter but were unsuccessful, and that they were out of radio range of the PGPD dispatcher. Rowe also expressed his belief that Willie Smith had contacted the CCSO. They also stated that while they had Anderson in the police cruiser, they turned on their emergency lights to signal a passing CCSO police cruiser, to no avail. Finally, Perry stated that he intended

14

to file a report and turn in the seized bicycles to PGPD the next day, but he was relieved of his duties before he could do so. Although all of these assertions are subject to challenge, when viewed in the light most favorable to the nonmoving parties, they refute the County's claim that the officers were acting completely outside the realm of police activity.

As for the unusual step of driving Anderson to a remote location and leaving him there, Perry explained that they would have taken him home, but he refused to give his address and, because they did not want him to return to collect the firearm they believed to be missing, they chose to drop him off at a location further away, but still one from which he could call on his cell phone for a ride home. Such an action was not so "unprovoked, highly unusual, and quite outrageous" as to be outside the scope of employment as a matter of law. The type of conduct falling into such a category generally consists of heinous crimes of a personal nature. *See, e.g., Wolfe v. Anne Arundel County*, 821 A.2d 52, 58 (Md. 2003) (rape of a citizen by a police officer). In *Cox v. Prince George's County*, 460 A.2d 1038 (Md. 1983), the plaintiff alleged that two police officers maliciously and intentionally allowed and encouraged a police dog to attack and bite the plaintiff and then subsequently beat and injured the plaintiff. *Id.* at 1039, 1043. The court held that, even taking those allegations as true, it could not hold as a matter of law that the officers' actions were so intentionally malicious that they acted outside the scope of their employment. *Id.* at 1042-43. Here, even considering the action of leaving Anderson at remote location, and the allegations that Perry assaulted Anderson, it is a question for the jury to decide whether such actions were so outrageous as to be outside the scope of their employment.[4]

---

[4] In its brief, the County also argued that the fact that Perry and Rowe had entered pleas of *nolo contendere* to charges of second-degree assault and were sentenced to imprisonment provided additional evidence that their conduct was of a "serious criminal nature" and therefore outside the scope of their employment as a matter of law. Mot. Summ. J. at 17. At oral argument, however, County counsel withdrew this argument.

Thus, upon consideration of the relevant factors, the Court concludes that the evidence is sufficient for a reasonable jury to conclude that Perry and Rowe acted within the scope of their employment. The Motion for Summary Judgment is therefore denied.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is DENIED. A separate Order follows.

Date: September 4, 2015

THEODORE D. CHUANG
United States District Judge